# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

SALAME M. AMR,

      Plaintiff,

v.                                               Civil Action No. 3:07cv628

VIRGINIA STATE UNIVERSITY, *et al.*,

      Defendants.

## REVISED REPORT AND RECOMMENDATION

This matter is before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) for a report and recommendation on Defendants' Motion for Summary Judgment. (Docket No. 35.) The matter has been fully briefed. Neither party sought a hearing, and a hearing would not aid the decisional process. The matter is now ripe for disposition.

The undersigned Magistrate Judge issued a Report and Recommendation on Defendants' Motion for Summary Judgment on December 3, 2008. (Docket No. 42.) On December 11, 2008, the parties appeared for a status conference before the Honorable Robert E. Payne. At that time, Plaintiff represented to the Court that he wished to proceed pro se and for his attorney to withdraw. The Court granted Plaintiff's counsel's oral motion to withdraw and Plaintiff's "Motion to Remove My Counsel" (Docket No. 44), and ordered the Clerk to file Plaintiff's "Urgent Motion for Relief" (Docket No. 45) and "Letter from Salame M. Amr" ("Letter") (Docket No. 46) for consideration by the undersigned Magistrate Judge in this revised Report and Recommendation. The Report and Recommendation issued on December 3 is now moot. (Order Filed Dec. 15, 2008.) (Docket No. 43.)

For the reasons stated below, the undersigned Magistrate Judge RECOMMENDS that

Defendants' Motion for Summary Judgment be GRANTED, and that Plaintiff's "Urgent Motion

for Relief" be DENIED AS MOOT.

## I. Background

Plaintiff Salame M. Amr was employed by Virginia State University ("VSU") as an

Assistant Professor in the School of Engineering, Science and Technology's Department of

Engineering and Technology ("Department") from August 2002 through May 2008. He applied

for tenure in 2006 and received notice in March 2007 that he would not be promoted to the rank

of Assistant Professor. (Thomas Aff. ¶ 14.) Dr. Amr filed a complaint alleging race and national

origin discrimination against VSU, VSU President Eddie N. Moore, Jr.,[1] Professor Nasser

Rashidi, Associate Dean Larry Brown, and Professor Keith Williamson in February 2007. His

Second Amended Complaint, filed on July 18, 2008, alleges three causes of action:

> Count One: Against VSU, through the actions of Dr. Moadab and Dr.
> Rashidi, for discrimination on the basis of race, national origin, and religion,
> under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2;
>
> Count Two: Against Dr. Rashidi, former chair of the Engineering
> Department, under the Civil Rights Act of 1866, 42 U.S.C. § 1981, for
> discrimination on the basis of race and national origin;
>
> Count Three: Against Dean Brown and Dr. Williamson for interference with
> Dr. Amr's Fourteenth Amendment right to procedural due process,[2] in
> violation of 42 U.S.C. § 1983.

---

[1] The Second Amended Complaint does not name President Moore as a defendant.

[2] "No State shall . . . deprive any person of life, liberty, or property, without due process
of law. . . ." U.S. Const. amend. XIV, § 1.

2

(2d Am. Compl. ¶¶ 50-52.) Count One is based on three allegations: disparate pay, disparate committee and service assignments, and the "ceaseless[] endeavoring to bring Dr. Amr before university authorities on false charges of plagiarism" by Drs. Moadab and Rashidi. (2d Am. Compl. ¶ 50.) Dr. Amr seeks back- and front-pay; damages for humiliation, pain and suffering, emotional distress, loss of personal and professional reputation; injury to his future career; attorney's fees; and costs of suit.

Plaintiff's "Urgent Motion for Relief," filed on December 15, 2008, appears to allege new claims of defamation and slander, and seeks additional relief not sought in his Second Amended Complaint, including reinstatement of his employment at VSU. The Court notes that Plaintiff did not move for leave to amend his Second Amended Complaint to add new claims, meaning his Motion lacks a proper legal foundation. Furthermore, to the extent that Plaintiff's recent filings are intended to supplement Plaintiff's opposition to Defendants' Motion for Summary Judgment, the Court notes that neither the "Urgent Motion for Relief" nor the "Letter from Salame M. Amr" are sworn under penalty of perjury. *See* Fed. R. Civ. P. 56(c) & (e). Additionally, neither document alleges material facts not already in the record. The Court will consider Plaintiff's recent filings "in perspective of so much of the information which appears in those documents as is appropriately considerable in assessing a motion for summary judgment," as directed by the referring Senior District Judge. (Order Filed Dec. 15, 2008, at 3.)

## II. Summary Judgment Standard

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled

3

to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving party is entitled to have "'the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

### III.  Summary of Facts

Viewing the facts in the light most favorable to Dr. Amr, the Court recites the pertinent facts below.

### A.    Employment at VSU

Plaintiff Amr is a Sunni Muslim and a native of Jordan. Dr. Hadi Moadab, then the Dean of VSU's Engineering and Technology Department, hired Dr. Amr in the fall of 2002 to serve as an Assistant Professor of Electronics Engineering Technology in VSU's Department of

4

Engineering and Technology.  (2d Am. Compl. ¶¶ 2, 7, 9.)  Dr. Moadab was a Shia Muslim and a native of Iran.  (2d Am. Compl. ¶ 9.)

Dr. Amr asserts that once he was hired, Dr. Moadab "virtually ignored Dr. Amr and refused to respect his scholarship or utilize his leadership skills."  (2d Am. Compl. ¶ 7.) Generally, Dr. Amr felt that Dr. Moadab was disrespectful of his race and national origin.[3]  For instance, Dr. Moadab apparently asked Dr. Amr if he were a "'wet' Muslim."[4]  (2d Am. Compl. ¶ 11.)  Dr. Amr alleges that his starting salary was lower than that of the other Department faculty members hired in fall of 2002; that he was denied the committee and teaching assignments he requested; and that he was denied travel and grant-writing opportunities afforded to other faculty members.[5]  (2d Am. Compl. ¶ 8.)

Dr. Amr served on five out of eleven Departmental committees in 2003:  Student Organizations, Recruitment & Retention, Faculty Development, Honors, and Accreditation. (Rashidi Aff. Ex. 1A.)  This was more than any other Department member.  (Id.)  In 2006, Dr. Amr served on three out of seven Departmental committees, including Accreditation and

---

[3] Dr. Amr states: "Dr. Moadab made a point of emphasizing my national origin and religion. He asked if I am Iraqi, noting that Iraq and Iran were enemies in an eight-year long war during the 1980s that inflicted heavy losses on both countries. Dr. Moadab expressed displeasure to learn that I was Jordanian, since Jordan had openly supported Iraq in the war against Iran. Dr. Moadab was also openly hostile towards me when he learned that I was Sunni not Shia Muslim." (Amr Decl. ¶ 5.)

[4] Dr. Amr stated that he learned that "wet Muslim" is a pejorative term for a Muslim who drinks alcohol. (Amr Dep. 103:9-19.)

[5] Dr. Amr served in the leadership of the VSU Faculty Senate, and was named VSU's "Employee of the Year" in 2005. (Amr Decl. ¶ 9; 2d Am. Compl. ¶ 13.)

Curriculum, Recruitment and Retention, and Student Organizations, Awards and Recognition. (Rashidi Aff. Ex. 1B.) This was average for the Department that year.[6] (*Id.*)

With regard to pay, Dr. Amr's starting salary was the second-lowest of the seven faculty members hired by the Department in fall of 2002. Dr. Amr alleges this to be evidence of disparate pay. Dr. Amr started at a salary of $64,000, four professors started at $68,000, one professor was paid $72,000, and one professor was paid $50,000 per year.[7] (Thomas Aff. ¶¶ 6-7 & Ex. 4, Peer Group Salary History.) Dr. Amr received a merit-based pay raise each year he was employed by VSU. (Thomas Aff. ¶ 8; Amr Dep. 51:17-19.)

Dr. Amr received reimbursement from VSU for travel-related expenses on at least thirty-seven occasions during the time he was employed as a professor. (Rashidi Aff. Ex. 2A.) The records show that Dr. Amr attended conferences and workshops in Honolulu, Hawaii, Las Vegas, Nevada, and other locales. Dr. Amr testified that he attended twenty-two workshops and conferences during the 2002-2003 academic year, sixteen workshops and conferences in the 2005-2006 academic year, and a comparable number (between ten and twenty) in the other years of his employment at VSU. (Amr Dep. 76:9-24, 80:16-25.) In his supplemental filings, Dr. Amr complains both that he had difficulty getting approval to travel (Letter ¶¶ 27, 29), and that VSU falsely claims students complained about his travel (Letter ¶ 21).

---

[6] Six faculty members served on four committees, ten served on three committees, and six served on two committees. (Rashidi Aff. Ex. 1B.)

[7] Defendants produced evidence that a starting professor's salary at VSU is based on his or her proposed rank and previous experience at other institutions of higher education, and that Dr. Amr's salary was comparable to the other faculty members hired in 2002. However, the record does not indicate the previous experiences of Dr. Amr's peers in the Department. Dr. Amr's position at VSU was his first full-time faculty position. (Amr Dep. 44:23-24.)

B.     **Plagiarism Allegation**

In January 2005, Dr. Amr submitted a paper to the Engineering Technology Division of the American Society for Engineering Educators ("ASEE") for consideration for publication at an upcoming ASEE conference. Dr. Amr states that, at the time, he had never published anything, and had not put any notice of his research on an intellectual property web site to advise other scholars of his work. (Amr Dep. 152:13-17.) Several days later, an ASEE moderator, Dr. Rockland, sent an email to Dr. Amr noting that there were commonalities between Dr. Amr's submission and a paper published in the proceedings of the previous year's ASEE conference, and asking Dr. Amr to address the commonalities. (2d Am. Compl. ¶ 14.) Dr. Amr's paper, which discussed how to use computer software tools to monitor and enhance electronics laboratory experiments in the engineering research field, was based on research similar to that undertaken by engineers at Texas A & M University in Kingsville ("TAMUK"). Dr. Amr asserts that he intended the paper he submitted to "piggyback" on the previously published TAMUK paper, and that it "plainly acknowledged" the work of the TAMUK authors. (2d Am. Compl. ¶ 16.)

After receiving the email about the commonalities, Dr. Amr responded by apologizing for submitting "an incomplete paper" and asked that it be withdrawn from consideration for publication. Dr. Amr states that he suffered from anxiety and emotional turmoil based on his perceived "inconsiderate treatment at work" and other personal issues, and therefore did not have the "wherewithal to directly address the commonalities between the papers" at that time. (2d Am. Compl. ¶ 17.) Several months later, the Chair of the ASEE Engineering Technology

7

Division sent an email to Dr. Rashidi, then Chair of the Department, advising Dr. Rashidi of the commonalities between Dr. Amr's submission and the TAMUK paper. (2d Am. Compl. ¶ 19.)

In August of 2005, Dr. Moadab confronted Dr. Amr with the accusation of plagiarism and asked him to resign his position as Vice-Chair of the Faculty Senate, threatening to "expose the accusation to all the faculty senators" if he did not. (2d Am. Compl. ¶ 21.) Dr. Amr approached Provost Thomas with the threat, who informed Dr. Amr that Drs. Moadab and Rashidi had already come to him with the plagiarism allegation. (*Id.*) Dr. Amr alleges that Provost Thomas indicated to Dr. Amr that he had advised Drs. Moadab and Rashidi to "drop the matter," because he did not consider the evidence they presented to him to be conclusive of plagiarism. (*Id.*)

In his supplemental filings, Dr. Amr contends that, because of racial and religious animus toward Dr. Amr, Dr. Moadab circulated a paper throughout VSU that he had forged to make it look as if Dr. Amr had plagiarized it. (Letter ¶ 10.) Dr. Amr contends such an act is obvious because Provost Thomas did not act on the first charge of plagiarism after reviewing in 2005 the actual paper Dr. Amr wrote. (Letter ¶ 6.)

### C.    Application for Tenure

Dr. Moadab passed away in February 2006. (2d Am. Compl. ¶ 23.)  Dr. Larry Brown became Interim Dean of the School of Engineering Science and Technology.  In June 2006, Dr. Keith Williamson replaced Dr. Rashidi as Chair of the Department. (*Id.*)  Dr. Amr applied for promotion and tenure at VSU in the fall of 2006. (2d Am. Compl. ¶ 24.)  On September 15, 2006, he submitted his application and dossier for tenure to Dr. Williamson for review. (Williamson Aff. ¶ 6.)  Dr. Williamson forwarded Dr. Amr's application to the Department's Promotion and Tenure Committee on October 13, 2006.  (Williamson Aff. ¶ 8.)  Although the

Department initially recommended Dr. Amr for promotion and tenure to Dean Brown, Dr. Williamson then became aware of the plagiarism allegation and, on November 29, 2006, requested that Dean Brown investigate the matter. (Williamson Aff. ¶¶ 9-11.)

On December 1, 2006, Dean Brown requested that the VSU Scientific and Integrity Committee ("SIC") convene and investigate the matter. (Brown Aff. ¶ 8.) The SIC determined that the allegations of plagiarism were substantiated, corroborating the ASEE moderator's findings of commonality with the TAMUK paper. The SIC found that Dr. Amr had failed to address the ASEE moderator's request for a response.[8] (Brown Aff. Ex. 3 (Memo to Brown and Williamson from the SIC).) Dean Brown informed Dr. Amr in February 2007 that the Department's Promotion and Tenure Committee could not give a favorable recommendation as to Dr. Amr's application for tenure. (Brown Aff. Ex. 4A (Letter from Brown to Amr).)

The University Promotion and Tenure Committee ("UPTC") ultimately recommended that Dr. Amr be denied tenure. (Defs.' Mem. ¶ 32; Thomas Aff. Ex. 11.) The UPTC based this decision on a determination that, despite his otherwise positive professional service to VSU, Dr. Amr's scholarly research activities were unsatisfactory due to the substantiation of an allegation of academic misconduct by the SIC. (Thomas Aff. Ex. 11.) Dr. Amr was notified of

---

[8] Dr. Amr claims that "the paper the SIC reviewed that was purportedly submitted to the ASEE by Dr. Amr was not written by him and was not the version that Dr. Amr submitted for possible publication in January 2005." (2d Am. Compl. ¶ 31; Urgent Mot. for Relief 2; Letter ¶ 6.) However, Dr. Amr does not dispute that the Chair of the SIC, through Dean Brown, requested that Dr. Amr provide the SIC with a copy of the paper he submitted to the ASEE in January 2005, and that Dr. Amr failed to do so. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") ¶¶ 20-21.) *See* Brown Aff., Ex. 6C (Email exchange between Amr and Brown) (Dr. Amr responded to Brown's request for the "correct" version of the paper by stating, "This request would not serve you or the committee in any way. It was never been uploaded.").

9

the UPTC's decision on March 28, 2007. (*Id.*) Dr. Amr disagreed with the UPTC's decision and decided to pursue an appeal to the Appeals Subcommittee of the Faculty Senate Committee on Reconciliation. (2d Am. Compl. ¶ 40.)

The Appeals Subcommittee considered Dr. Amr's appeal and recommended that the SIC reconvene so that Dr. Amr could defend himself and his paper in person. (2d Am. Compl. ¶ 40; Thomas Aff. ¶ 18.) The SIC reconvened on May 23, 2007, to review the plagiarism accusation and hear Dr. Amr's testimony. The following day, the SIC deliberated and determined that Dr. Amr's explanations of the commonalities in the two papers did not address or explain the points that were raised by the ASEE moderator. (Brown Aff. Ex. 8 (Memo from Dr. Oliver Hill, Jr., SIC Chair, to Dr. Serena Reese, Appeals Subcommittee Chair).) Therefore, the reconvened SIC reaffirmed the findings of the original SIC that "overwhelming evidence of plagiarism" existed. (*Id.*) The Appeals Subcommittee then notified Dr. Amr that the Subcommittee agreed with the SIC and would not overturn the decision to deny tenure.

Dr. Amr personally appealed to VSU President Moore in June 2007, challenging the handling of the charge of plagiarism in the tenure review process. (2d Am. Compl. ¶ 44.) Dr. Moore denied this appeal. (*Id.*; Thomas Aff. Ex. 14 (June 15, 2007, Letter from Moore to Amr.) On July 17, 2007, VSU offered Dr. Amr a term appointment as an Assistant Professor for the 2007-2008 academic year, which Dr. Amr accepted. (2d Am. Compl. ¶ 45.) Dr. Amr's employment with VSU terminated in May 2008. (*Id.*)

Dr. Amr filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on October 10, 2007, asserting race, national origin, and religious discrimination, and received a right-to-sue letter on July 1, 2008. (2d Am. Compl. ¶ 49.)

## IV.  Title VII Claims

In Count One, Dr. Amr alleges that VSU, through the actions and decisions of Drs. Moadab and Rashidi, violated Title VII of the Civil Rights Act of 1964 based on his Arab race, Jordanian national origin, and Sunni Muslim religion.  He alleges three specific areas of misconduct:  (1) disparate pay; (2) unequal committee assignments and travel opportunities;  and (3) false claims of plagiarism.  The Court RECOMMENDS dismissal of all Title VII claims because the statute of limitations bars action on any of them.

### A.     Disparate Pay

In order for a plaintiff to pursue a Title VII claim in federal court in Virginia, a charge must be filed with the EEOC within 300 days of the date the "alleged unlawful employment practice occurred."  *See* 42 U.S.C. § 2000e-5(e)(1); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 440 (4th Cir. 1998).

Dr. Amr filed an EEOC complaint on October 10, 2007.  He claims he did not receive an appropriate salary when hired, and that discriminatory pay constitutes "an on-going violation, as opposed to a discrete act as termination, failure to promote, denial of transfer or refusal to hire. Each such [paycheck] constitutes a separate actionable 'unlawful employment practice' under 42 U.S.C. § 2000e-5(e)(1)."  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 5) (*citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).)

The Supreme Court of the United States soundly rejected this approach as to pay discrimination claims in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007).  In *Ledbetter*, the Supreme Court held that the initial pay-setting decision is a "discrete act" rather

11

than an on-going violation, and therefore the period for filing an EEOC charge begins when that act occurs. *Id.* at 2165.

The undisputed record here shows that the initial pay-setting decision occurred on June 3, 2002, when VSU offered employment to Dr. Amr as an Assistant Professor at a contract salary of $64,000.[9] (Thomas Aff. Ex. 1.) Dr. Amr does not claim that he was denied pay raises in subsequent years, or that he was subjected to unequal evaluation processes that resulted in his being given smaller raises than his colleagues. (2d Am. Compl. ¶ 8 ("Dr. Amr was started at a lower salary than the six other E&T faculty members hired in the Fall of 2002.").)[10]

Dr. Amr filed his EEOC complaint 1,955 days after the initial pay-setting decision. He does not allege any discriminatory pay-setting decisions to have occurred within the 300-day period before he filed his EEOC complaint. His disparate pay claim is therefore time-barred and that aspect of Count One cannot succeed under Title VII.

**B.   Unequal Committee Assignments, Travel, and Research Opportunities**

Dr. Amr concedes that Defendants produced evidence showing that he received committee assignments on par with his colleagues in the Department in 2003 and 2006. (Pl.'s Opp'n 6.) Dr. Amr served on committees in every academic year subsequent to 2002-2003.

---

[9] *Cf. Del. State Coll. v. Ricks*, 449 U.S. 250, 257-58 (1980) (holding that, where plaintiff did not identify a specific discriminatory act "that continued until, or occurred at the time of, the actual termination of his employment," the EEOC charging period ran from the time the unfavorable decision was made and communicated to the plaintiff). *See also Ledbetter*, 127 S. Ct. at 2168 ("A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.").

[10] Dr. Amr does not raise any dispute as to the extensive documentation VSU offers as to its objective merit- and performance-based salary review procedures. (Thomas Aff. & Exs. 2-8.)

12

(Amr Dep. 35:17-25.) He claims, however, that he received no committee assignments for the 2002-2003 academic year, his first at VSU. (Amr Dep. 35:13-14.) Thus, Dr. Amr's unequal committee assignments claim is limited to his allegation that "he was given sparse assignments upon commencing employment."[11] (Pl.'s Opp'n 6.) This claim accrued sometime in the fall of 2002, far more than 300 days before Dr. Amr filed his EEOC complaint on October 10, 2007. Therefore, Plaintiff's disparate treatment claim is time-barred and that aspect of Count One also cannot succeed under Title VII.

Finally, without specifying time or place, Plaintiff states in general and conclusory terms that he "was denied travel opportunities granted other faculty," and "was denied grant-writing opportunities and other assistance that was afforded to other faculty members." (2d Am. Compl. ¶ 8.) He offers no supporting evidence, neither in the form of exhibits nor in his Declaration, to support his allegation.[12] Defendants, on the other hand, produced evidence that VSU provided monetary support for Dr. Amr to travel extensively for work purposes, and that VSU awarded him at least two research grants while he worked at VSU. (Rashidi Aff. Exs. 2A, 2B, 3, 4A & 4B.) Because Dr. Amr has failed to go beyond his pleadings and demonstrate "specific facts showing that there is a genuine issue for trial" on these claims, summary judgment in favor of Defendants on this aspect of Count One is appropriate. *See Celotex*, 477 U.S. at 324; *Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 479 (E.D. Va. 1999) ("The plaintiff's 'own naked

---

[11] The Court notes that limiting committee assignments for new faculty is equally consistent with the positive employment practice of allowing a new employee time to adjust and focus on the primary duty of teaching.

[12] Plaintiff's supplemental filings undercut his claim of denial of travel opportunities to some degree. In his Letter to the Court, Dr. Amr charges that VSU falsely claimed that his students complained about his traveling too much. (Letter ¶ 21.) If VSU made such a charge, it is not in the record in any event.

opinion, without more,' is not enough to establish a genuine issue of fact.") (*citing Goldberg v. B. Green & Co.*, 836 F. 2d 845, 848 (4th Cir. 1988)).

### C.      Discrimination Based on "False Charges" of Plagiarism

Plaintiff also seeks relief under Title VII on the theory that VSU, through Dr. Moadab and Dr. Rashidi, "ceaselessly endeavor[ed] to bring Dr. Amr before university authorities on false charges of plagiarism on account of his Arab race, Jordanian national origin and Sunni Muslim religion." (2d Am. Compl. ¶ 50.) The undisputed record indicates that the statute of limitations bars this claim as well.

Plaintiff alleges that Dr. Moadab "confronted Dr. Amr with the accusation of plagiarism" in the presence of the Chair of the Faculty Senate in mid-August 2005 and asked him to resign his position as Vice-Chair of the Faculty Senate. (2d Am. Compl. ¶ 21.) Dr. Moadab "threatened to expose the accusation to all the faculty senators if Dr. Amr didn't resign." (2d Am. Compl. ¶ 21.)

Plaintiff specified in his pleading that Count One was predicated on the alleged actions of Drs. Moadab and Rashidi only. Dr. Moadab passed away in April 2006, and Dr. Williamson replaced Dr. Rashidi as Chair of the Department in June 2006. Thus, neither named defendant could have acted on behalf of VSU to take an "unlawful employment action" toward the Plaintiff within the meaning of Title VII on or after December 12, 2006 (the 300-day period before Plaintiff filed his EEOC complaint on October 8, 2007). This aspect of Count One is time-barred.

For the reasons stated above, the Court RECOMMENDS DISMISSAL of Count One in its entirety because the statute of limitations bars each claim raised in that Count.

14

## V. Section 1981 Claim

Plaintiff acknowledges in his Memorandum in Opposition to Defendants' Motion for

Summary Judgment that his claim against Dr. Rashidi under 42 U.S.C. § 1981[13] cannot stand,

because 42 U.S.C. § 1983 is the "'exclusive federal remedy for violation of the rights guaranteed

in § 1981.'" *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (*quoting Jett v. Dallas

Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). (Pl.'s Opp'n 6.) Dr. Amr's § 1981 claim cannot

proceed as a matter of law, and the Court RECOMMENDS DISMISSAL of Count Two.

## VI. Due Process Claim under § 1983

Dr. Amr alleges that Dean Brown and Dr. Williamson, who became Chair of the

Department in June 2006, are liable to him under 42 U.S.C. § 1983[14] for depriving him of his

Fourteenth Amendment right to due process by infringing upon his liberty interest in his good

---

[13] Section 1981, as amended, provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

[14] Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

15

name and reputation in the context of his employment at VSU.[15] Dean Brown and

Dr. Williamson are the named defendants in this claim because Dr. Williamson brought the

plagiarism allegations to the attention of Dean Brown, who requested that the SIC convene to

investigate the matter.

A.    **Liberty Interest in One's Reputation and Good Name**

The Fourteenth Amendment encompasses distinct liberty rights, including the liberty "to

engage in any of the common occupations of life," *Bd. of Regents of State Colls. v. Roth*, 408

U.S. 564, 572 (1972), and the right to due process "[w]here a person's good name, reputation,

honor, or integrity is at stake because of what the government is doing to him," *Wisconsin v.*

*Constantineau*, 400 U.S. 433, 437 (1971). *See Sciolino v. City of Newport News*, 480 F.3d 642,

646 (4th Cir. 2007). In order to prevail on a claim for a violation of this type of liberty interest

under the Due Process Clause of the Fourteenth Amendment, a plaintiff must prove that the

charges against him: "(1) placed a stigma on his reputation; (2) were made public by the

employer; (3) were made in conjunction with his termination or demotion; and (4) were false."

*See Sciolino*, 480 F.3d at 646 (*citing Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172

---

[15] Dr. Amr states specifically that he is alleging a liberty interest in defending himself against a serious charge of academic misconduct, and that he is not alleging a property interest in continued employment as a professor. (Pl.'s Opp'n 7.) *See also id.* at 8 ("Dr. Amr is not asking this Court to review VSU's tenure decision."). However, Dr. Amr now also seeks reinstatement at VSU as a remedy to the loss of reputation he has suffered. (Urgent Mot. for Relief 3; Letter ¶ 1.) The Court notes again that Dr. Amr did not seek leave of the Court to amend his Complaint to properly seek such a remedy, *see supra* at 3. Even if Dr. Amr were unambiguously asserting a property interest in his employment at VSU, an untenured professor such as Dr. Amr has no constitutionally protected property interest in continued employment. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972).

16

n.5 (4th Cir. 1988)); *Bell v. Town of Port Royal, S.C.*, --- F. Supp. 2d ---, 2008 WL 1849865, at *17-18 (D.S.C. 2008) (adopting *Sciolino* test for summary judgment purposes).

Before the Court can address what Fourteenth Amendment process was due, it must determine whether Dr. Amr had a liberty interest to protect. While Plaintiff may meet some aspects of the *Sciolino* test, the Court questions whether he can establish each element.

As to the first prong, substantiating an allegation of plagiarism certainly stigmatizes a university professor's reputation, so Dr. Amr's claim meets that requirement. *See Roth*, 408 U.S. at 573. As to the second prong, the record is not well-developed as to whether the plagiarism charges were "made public" by VSU officials. The Court will assume that Dr. Amr could show that the charges were made public.[16] As to the third prong, Dr. Amr's tenure application in the fall of 2006 resulted in the plagiarism accusation's reemergence, and the plagiarism allegation

---

[16] This may be a generous presumption. The United States Court of Appeals for the Fourth Circuit has held that a plaintiff may prove the "publication" element by showing either that a former employer has a practice of releasing personnel files to all inquiring employers, or that the former employer releases personnel files only to certain inquiring employers, and the plaintiff intends to apply to at least one of those employers. *Sciolino*, 480 F.3d at 650. Dr. Amr argues that the charges were "alleged to have been publicized on to Dr. Amr's colleague's [sic] by Dr. Moadab." (Pl.'s Opp'n 8.) This claim is insufficient because, first, a mere *allegation* of publication will not suffice to defeat summary judgment, unsupported by other evidence. Second, because Plaintiff named Dr. Williamson and Dean Brown as the defendants to this Fourteenth Amendment claim, the actions of Dr. Moadab in telling other faculty members about the allegation would not necessarily create liability on the part of Dr. Williamson and Dean Brown.

The record contains no reference to Dr. Amr's personnel file, and is silent as to whether the SIC's findings were ever disclosed to anyone outside of VSU or the ASEE. Certainly, Dr. Amr makes no proffer as to publication, or any attempts to secure employment since May 2008. His Declaration merely asserts, "Prospective employers would take the same adverse action against me as VSU did unless I was proven not guilty of academic misconduct at this time." (Amr Decl. ¶ 39.) His "Urgent Motion for Relief" states that he has "been unemployed for five months now" and that he has "experienced real difficulties in finding an academic job at this time," but provides no detail as to whether he has actually applied to any academic institutions. (Urgent Mot. for Relief 2-3.)

therefore occurred "in conjunction with" VSU's decision to deny tenure. (Amr Decl. ¶ 21

("Dr. Williamson acknowledged that the conclusions of any such 'independent committee'

would have direct bearing on my pending tenure application.").)

Still, the record does not conclusively establish that Plaintiff can meet the fourth prong of

the *Sciolino* test. Defendants offered sworn affidavits and documents showing that VSU

administrators concluded that the plagiarism allegation was substantiated. Defendants also

offered supporting documentation they used in making that finding. Thus, testimony and some

documentation supports the finding that the plagiarism charge was not false. In response,

Dr. Amr merely alleges otherwise. He offers no documentation rebutting the presentation by

VSU.

Dr. Amr acknowledges that he submitted a paper to the ASEE that had extensive

commonalities with a previously published paper. He asserts that the paper he submitted was

intended to "piggyback" the research of the TAMUK authors, "for the sake of consistency of

presentation and for purposes of comparison." (2d Am. Compl. ¶ 16.) Dr. Amr offered no

evidence that the commonalities pointed out to him by the ASEE moderator in January 2005 are

not indicative of plagiarism, and the undisputed record shows that he withdrew the paper from

consideration for publication rather than defend the integrity of his work before the ASEE.[17]

_____

[17] The parties have proffered evidence suggesting a factual dispute over whether Dr. Amr "withdrew" his paper from consideration by ASEE, or whether it was "rejected" for publication. (Amr Dep. 149:18-150:1 & Defs.' Ex. 26 (2007 emails between the ASEE moderator Dr. Rockland and Dr. Amr regarding whether the paper was withdrawn or rejected); Brown Aff. Ex. 3 (Memo from SIC Chair to Dean Brown and Dr. Williamson reporting the findings of the SIC, including that "[t]he manuscript in question was rejected based on the moderator comments"); (Letter ¶¶ 5, 7.) To the extent that a dispute exists, it does not rise to a material level, and the Court can presume that Dr. Amr withdrew the paper. The undisputed record

Dr. Amr does not dispute that the ASEE moderator, Dr. Rockland, sent the email in the Defendants' record questioning his submitted work. The email from Dr. Rockland lists commonalities difficult to deem coincidental on any reading of the record. (Brown Aff. Ex. 2B.) Among other things, three sentences in the abstract of each paper were very similar; the heading format used in each paper deviated from the ASEE-specified "author kit" formatting, but was identical in the Amr and TAMUK papers; nine graphs and charts were identical in both papers, including labeling errors; and the last line of the bibliography in each paper included the phrase, "he involved into the research areas of renewable energies, neural networks and applications," both mistakenly using the word "involved" instead of "evolved." (Brown Aff. Ex. 2B.) Even accepting Dr. Amr's explanation that he intended to submit a paper "that acknowledged the TAMUK work, whose findings he then corroborated with experiments by his own students" (2d Am. Compl. ¶ 15), the Court notes that he never disputes the commonalities themselves. Nor does Dr. Amr claim that the paper he submitted to ASEE contained independently gathered data that would demonstrate that his paper differed substantially from the TAMUK paper. Most importantly, he has not proffered a copy of the paper itself to dispute the plagiarism charge in this forum.

Instead, Dr. Amr suggests that the plagiarism allegations are false because:

[T]he paper reviewed by the SIC contained many more areas on [sic] commonality than cited by Dr. Rockland. Indeed, the SIC papers [sic] appears more like an amateurish effort to copy the text of the TAMUK paper that changed just a few words. My original drafted paper was tampered with to look very bad and an apparent case of plagiarism.

---

nonetheless shows that Dr. Amr's withdrawal stemmed from the unanswered charge of plagiarism by Dr. Rockland.

(Amr. Decl. ¶ 27.)  *See also* Urgent Mot. for Relief 2; Letter ¶¶ 6, 10.  This allegation might raise

an issue of fact as to whether the paper the SIC reviewed in assessing the plagiarism charge was

in fact the paper Dr. Amr submitted to the ASEE.  However, Dr. Amr has failed to support this

allegation with any sort of evidence, such as the "original drafted paper" he claims he submitted

to ASEE for review by Dr. Rockland.  Rule 56(e)(1) states, "If a paper or part of a paper is

referred to in an affidavit, a sworn or certified copy must be attached to or served with the

affidavit."  Dr. Amr refers to an "original drafted paper" in his affidavit, but did not follow the

directives of Rule 56(e)(1) by attaching that paper, much less a sworn or certified copy, as an

exhibit to his Opposition to Defendants' Motion for Summary Judgment.[18]  Dr. Amr also does

not dispute that, when given an opportunity to provide the "correct" paper to the SIC in February

2007, he declined to do so, stating in an email to Dean Brown: "This request would not serve you

or the committee in any way.  It was never been uploaded."  (Brown Aff. Ex. 6C.)  Under

*Sciolino*, he must show falsity,[19] and he does not do so via his affidavit.

---

[18] Therefore the Court cannot consider Dr. Amr's argument that the SIC reviewed a forged or tampered-with paper, nor deem that argument to constitute a genuine issue of material fact.  *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."); *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1261-62 (9th Cir. 1993); *Peterson v. United States*, 694 F.2d 943 (3d Cir. 1982).

[19] The Court notes that Defendants also failed to produce the offending papers for the Court to review, which precludes the Court from making an ultimate finding, on summary judgment, as to the falsity prong of the *Sciolino* test.  Moreover, Dr. Amr's assertion that Provost Thomas knew about the allegation of plagiarism and advised Drs. Rashidi and Moadab in 2005 to "drop" the issue because "he did not consider the evidence to arise to the level of plagiarism" (2d Am. Compl. ¶ 21; Letter ¶ 6) went undisputed by Defendants.  This allegation might raise a factual issue as to falsity, even given Dr. Thomas's acquiescence to the finding during the SIC review process.  For the reasons stated *infra*, and considering the record as a whole, however, Dr. Amr fails to raise a material dispute even given Provost Thomas's earlier inaction.

In a position slightly inconsistent with a claim that no plagiarism occurred, Dr. Amr suggests that somehow the commonalities should have been excused because he was experiencing severe personal problems during the month he submitted the paper to ASEE, and did not "have the wherewithal to directly address the commonalities between the papers" when pressed for an explanation by the ASEE moderator.  (2d Am. Compl. ¶ 17; Letter ¶ 4.)  Dr. Amr has now had nearly four years to explain the commonalities, and he has never done so, despite ample opportunities before the SIC and this Court.  Without more, he merely "asserts that the allegation was false."  (Pl.'s Opp'n 8.)  While such an assertion would be sufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it cannot survive a motion for summary judgment where the Defendants have offered exhibits establishing evidence of plagiarism.

A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading," but must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Defendants have provided sworn affidavits and documents indicating that the plagiarism allegation was substantiated.  In opposition, Dr. Amr relies only on his pleading and his sworn declaration, which offers little substance beyond his pleading.[20]  However, the Court need not rest its decision on *Sciolino's* fourth prong.  Because the record is inconsistent, the Court will presume a liberty interest exists, and turn to Dr. Amr's due process claim.

---

[20] The "Letter From Salame M. Amr" contains more details and the mental impressions of Dr. Amr regarding the events related in his Second Amended Complaint and Declaration.  As previously noted, the letter is unsworn, and therefore improper for the Court to consider for summary judgment purposes.  *See Orsi*, 999 F.2d at 92.  However, even if the Letter did conform to the requirements of Rule 56, the information it provides would not resolve Court's inability to determine the falsity *vel non* of the plagiarism charge.

21

## B.   Due Process Afforded to Rebut Allegation of Plagiarism

Even assuming that Dr. Amr could prove the falsity of the plagiarism allegation, and that

he therefore possessed a liberty interest protected by the Fourteenth Amendment, his claim would

still fail.  The undisputed record shows that the Defendants comported with the Due Process

requirements of the Fourteenth Amendment by providing Plaintiff with several opportunities to

rebut the plagiarism allegation.

Once a liberty interest is established in the context of damage to one's reputation during

the course of termination from public employment, the aggrieved party must be given the

opportunity to refute the charge against him or her.  While the due process required to protect a

property interest typically involves a pre-deprivation hearing, "it does not necessarily follow that

such a requirement exists in the context of liberty interests." *Bell*, 2008 WL 1849865, at *21.

The purpose of due process to protect a liberty interest in one's reputation is simply to provide an

opportunity to clear one's name.  *Codd v. Velger*, 429 U.S. 624, 627 (1977) ("[T]he hearing

required where a nontenured employee has been stigmatized in the course of a decision to

terminate his employment is solely to provide the person an opportunity to clear his name.")

(internal citation omitted); *see also Roth*, 408 U.S. at 573 n.12.  Significantly, "the hearing need

not take place prior to his termination or to the publication of related information adverse to his

interests." *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1046 (11th Cir. 1989) (*quoting*

*Campbell v. Pierce County, Ga.*, 741 F.2d 1342, 1345 (11th Cir. 1984)); *Bell*, 2008 WL

1849865, at *22.

VSU officials gave Dr. Amr the opportunity to respond to the SIC's original

determination that the allegations of plagiarism were substantiated nearly one month before the

22

UPTC concluded its deliberations on faculty applications for promotion and tenure. The first

SIC convened in early January 2007 and informed Dean Brown on January 8, 2007, that the

allegations of misconduct were substantiated. (Brown Aff. Ex. 3.) Dr. Williamson apprised

Dr. Amr of the SIC's finding "shortly thereafter." (2d Am. Compl. ¶ 32.) Dr. Amr responded by

writing "a lengthy memorandum defending" himself, which he emailed to Dean Brown to

forward to the SIC. (Amr Decl. ¶ 29; Brown Aff. Ex. 6B.) The February 26, 2007 emails state

that Dean Brown sent Dr. Amr's memorandum to the Chair of the SIC, Dr. Mohamed, and that

Dr. Mohamed immediately reviewed Dr. Amr's memorandum in defense of the plagiarism

allegation. (Brown Aff. Ex. 6B.)   Dr. Mohamed responded by requesting, through Dean Brown,

that Dr. Amr produce the allegedly "correct" paper within 48 hours. (*Id.*) Dr. Amr declined to

provide the "correct" paper, but added, "I still would like to get the response to the forwarded

letter from me to the Scientific Integrity Committee. Please kindly request that response."

(Brown Aff. Ex. 6C.)

  After being informed that he had been denied tenure on April 13, 2007, Dr. Amr

submitted a four-page appeal to the Appeals Subcommittee of the Faculty Senate Committee on

Reconciliation explaining "in substantial detail the reason for the commonalities between his and

the TAMUK papers." (2d Am. Compl. ¶ 40.) The Appeals Subcommittee recommended that the

SIC reconvene to permit Dr. Amr an opportunity to defend himself against the plagiarism charges

in a formal proceeding. (*Id.*) The SIC met to hear Dr. Amr's testimony on May 23, 2007, and

reconvened the following day to deliberate. (Brown Aff. Ex. 8.) The group unanimously

reaffirmed the January 8 findings of the SIC and concluded that there was "overwhelming

evidence of plagiarism." (*Id.*) He never provided documentation of the "correct" paper, nor was

he able to adequately explain the sixteen "commonalities" between his paper and the TAMUK paper, either in the SIC proceedings or in this litigation.

Although he was not given an opportunity to present his side of the story during the first SIC proceedings in January 2007, Dr. Amr did receive the benefit of post-deprivation process before any final decision emerged. The exchange of information between Dean Brown, Dr. Mohamed, and Dr. Amr in February 2007, and the second SIC proceedings in May 2007, provided adequate opportunities for Dr. Amr to clear his name both before and after the tenure decision was made. Thus, Dr. Amr's Due Process rights were not violated. *See Agarwal v. Regents of the Univ. of Minn.*, 788 F.2d 504, 508 (8th Cir. 1986) ("[T]hat the full formal procedural safeguards of the fourteenth amendment may not have been observed during the proceedings of the initial [committee investigation of a tenured professor's professional competence] does not establish that Agarwal's right to procedural due process was violated in light of the formality of the later hearings.").

Because Defendants afforded Plaintiff constitutionally required due process through both formal and informal opportunities for Plaintiff to refute the charge of plagiarism, the Court RECOMMENDS DISMISSAL of Count Three.

## VII. Conclusion

For the foregoing reasons, the undersigned Magistrate Judge hereby RECOMMENDS that Defendants' Motion for Summary Judgment be GRANTED. (Docket No. 35.) Because his "Urgent Motion for Relief" is based on the same factual predicate as the claims in his Second Amended Complaint, the undersigned Magistrate Judge hereby RECOMMENDS that Plaintiff's "Urgent Motion for Relief" be DENIED AS MOOT. (Docket No. 45.)

24

The parties are ADVISED that they may file specific written objections to the Report and Recommendation within ten (10) days of the date of entry hereof. Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. Failure to file specific objections to the Report and Recommendation in a timely manner may result in the entry of an Order dismissing the Complaint. *See* Fed. R. Civ. P. 72(b). It may also preclude further review or appeal from such judgment. *See Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

The Clerk is directed to send a copy of the Report and Recommendation to Plaintiff, to counsel of record, and to the Honorable Robert E. Payne.

/s/

M. Hannah Lauck
United States Magistrate Judge

Date: 12/23/08
Richmond, Virginia

25